UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

Zachary W. Callantine,

    Plaintiff,

vs.

Centurion Health of Indiana, LLC, et. al.
Elizabeth Bennett,
Centurion Nurse "Sam,"
Centurion Nurse "Bre,"
Centurion Nurse "Heather,"
Centurion Nurse 1,
Centurion Nurse 2,
Dr. Samuel Byrd, MD,
Dr. Campbell,
Kimberly Hobson,
Bobby Riggs,
Taylor Berg,
Frank Vanahiel,

    Defendants.

Case No.: 2:23-cv-00559-JRS-MJD
(TO BE SUPPLIED BY THE CLERK)

FILED
12/07/2023
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Roger A.G. Sharpe, Clerk

## VERIFIED COMPLAINT FOR DAMAGES

### I. INTRODUCTION

1. This is a §1983 action filed by Plaintiff Zachary W. Callantine, a state prisoner, alleging violation of his constitutional rights under the First and Eighth Amendments. Plaintiff seeks monetary damages against each individual Defendant.

### II. JURISDICTION

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 in that this is a civil action arising under the Constitution of the United States.

3. Jurisdiction of the Court is invoked pursuant to 28 U.S.C. §1343(a)(3) in that this action seeks to redress the deprivation, under color of state law, of rights secured by the Fourteenth Amendment to the U.S. Constitution providing for equal rights of persons within the jurisdiction of the United States.

4. Jurisdiction of this Court is invoked as all alleged relevant actions or inactions at issue herein occurred in Carlisle, Indiana, which lies within the geographic jurisdiction of this Court.

5. Callantine has filed no previous lawsuits.

1

## III. PARTIES

6. Plaintiff Zachary Callantine, at all times relevant to the instant proceeding, was confined by the Indiana Department of Corrections (IDOC) at Wabash Valley Correctional Facility (WVCF), in Carlisle, Indiana.
7. Defendant Centurion Health of Indiana, LLC, (CHI), is a private corporation which has been, at all relevant times, under contract with IDOC to provide medical care and services to inmates confined within INDOC, including Zachary Callantine.
8. CHI's address is 550 N. Meridian Street, Suite 101, Indianapolis, IN 46204.
9. Defendant Elizabeth Bennett, at all relevant times, was a nurse employed by CHI. She is being sued in her individual and official capacities.
10. Defendant Nurse Sam, at all relevant times, was a nurse employed by CHI. She is being sued in her individual and official capacities.
11. Defendant Nurse Heather, at all relevant times, was a nurse employed by CHI. She is being sued in her individual and official capacities.
12. Defendant Nurse Bre, at all relevant times, was a nurse employed by CHI. She is being sued in her individual and official capacities.
13. Defendant Centurion Nurse 1, at all relevant times, was a nurse employed by CHI. She is being sued in her individual and official capacities.
14. Defendant Centurion Nurse 2, at all relevant times, was a nurse employed by CHI. She is being sued in her individual and official capacities.
15. Defendant Dr. Samuel Byrd, at all relevant times, was a doctor employed by CHI. He is being sued in his individual and official capacities.
16. Defendant Dr. Campbell, at all relevant times, was a doctor employed by CHI. She is being sued in her individual and official capacities.
17. Defendant Kimberly Hobson, at all relevant times, was a nurse employed by CHI. She is being sued in her individual and official capacities.
18. Defendant Bobby Riggs, at all relevant times, was a nurse practitioner employed by CHI. She is being sued in her individual and official capacities.
19. Defendant Taylor Berg, at all relevant times, was a nurse employed by CHI. She is being sued in her individual and official capacities.

20. Defendant Vanahiel, at all relevant times, was the Warden at WVCF. He is being sued in his individual and official capacities.
21. Defendants Bennett, Sam, Heather, Bre, Berg, Hobson, Riggs, Centurion Nurse 1, Centurion Nurse 2, Byrd, Campbell, and Vanahiel, at all relevant times, were acting under the color of state law in relation to the events called into question by the instant complaint.

## IV. EXHAUSTION OF REMEDIES

22. Plaintiff exhausted all of his available administrative remedies before filing the instant complaint.

## V. CAUSES OF ACTION

23. Count 1: Defendants Bennett, Bre, Sam, Heather, Dr. Campbell, and Dr. Byrd, individually and collectively, denied Plaintiff pain medicine for the unremitting, intense, excruciating pain resulting from his MRSA infection, thereby prolonging Plaintiff's pain for a non-medical reason in violation of the Plaintiff's rights under the Eighth Amendment.
24. Count 2: Defendants Bennett, Bre, Sam, Centurion Nurse 1, and Centurion Nurse 2 delayed treatment for Plaintiff's MRSA infection, thereby exacerbating Plaintiff's condition for a non-medical reason in violation of Plaintiff's rights under the Eighth Amendment.
25. Count 3: Defendants Bennett, Bre, Sam, Heather, Dr. Campbell, and Dr. Byrd conspired to and did in fact deprive Plaintiff of the recommended pain medicine, all in violation of Plaintiff's rights under the Eighth Amendment.
26. Count 4: Defendant Centurion Nurse 1 retaliated against Plaintiff for filing a grievance against prison medical staff by denying Plaintiff prompt treatment for his painful MRSA infection, all in violation of Plaintiff's rights under the First Amendment.
27. Count 5: Defendant Centurion Health of Indiana, LLC maintained a policy that, in addition to the alleged conspiracy, was the direct cause of the prison medical staff Defendants' withholding of the recommended treatment of pain medication, which resulted in the prolonging of Plaintiff's pain for a non-medical reason, in violation of Plaintiff's rights under the Eighth Amendment.
28. Count 6: Defendants Hobson and Berg were deliberately indifferent to Plaintiff's excruciating medical condition when Hobson and Berg were informed of Plaintiff's condition from a blood

test, but failed to treat Plaintiff's debilitating MRSA infection, all in violation of Plaintiff's rights under the Eighth Amendment.

29. Count 7: Defendant Riggs was deliberately indifferent to Plaintiff's severe pain and serious medical condition when Riggs knew about Plaintiff's MRSA infection yet failed to use her authority over prison medical staff to provide adequate medical care to Plaintiff resulting the injuries sustained by the Plaintiff from WVCF nursing staff, at issue herein.

30. Count 8: Defendant Centurion Health of Indiana, LLC employed Defendants Bennett, Bre, Sam, Heather, Dr. Campbell, Dr. Byrd, Centurion Nurse 1, and Centurion Nurse 2, who, during the course of their employment, violated Plaintiff's constitutional rights.

31. Count 9: Defendant Vanahiel was deliberately indifferent to Plaintiff's serious medical needs by failing to exercise the authority of his position to ensure that prison medical staff provided constitutionally adequate treatment for Plaintiff's severe pain resulting from his infection after Vanihiel was fully apprised of the relevant circumstances by the Plaintiff herein.

## VI. STATEMENT OF FACTS

**General facts about the alleged violations:**

32. Each of the Defendants, aside from Vanahiel, are employed by Centurion Health of Indiana, LLC, and were working at the Wabash Valley Correctional Facility during the period of time relevant to the alleged constitutional violations at issue herein.

33. Bobby Riggs is a nurse of higher authority than the rest of the nurse defendants in the instant case and knew of Plaintiff's injuries, her obligation to ensure adequate medical care to Plaintiff, and the reasonable risk of harm to Plaintiff resulting from her inaction.

34. Defendant Vanahiel was the Warden at WVCF during the period of time relevant to the alleged constitutional violations at issue herein.

35. Centurion is contracted by IDOC to provide Health Care Services to its inmate population.

36. Each named Defendant is aware of their duty and obligation to provide, or to ensure the provision of, constitutionally adequate medical treatment to the prison population.

37. Each named Defendant was repeatedly put on notice of the infection that Callantine had suffered from and of the severity of the pain caused by said infection's rapid progression.

4

38. Each named medical Defendant repeatedly failed to exercise reasonable professional medical judgment and deliberately delayed Callantine's treatment with antibiotics and/or pain medication for non-medical reasons.
39. The herein above-referenced delays in antibiotic treatment allowed Callantine's infection to rapidly spread and increase in severity, and its associated symptoms (aside from the severe pain) did not abate until after several days of the indicated, albeit delayed, antibiotic treatment.
40. Treatment with pain medication for Callantine's reportedly severe pain was repeatedly recommended by Defendants Bennett, Bre, Sam, Heather, Dr. Campbell, and Dr. Byrd, yet was nonetheless withheld for non-medical reasons.
41. Callantine's reported severe pain did not abate for nearly a week until he had finally received the recommended pain medication from prison medical staff and only after his having suffered from excruciating, unremitting pain due to Defendants' individual and collective deliberate indifference to his serious health condition and resultant suffering.
42. The pain medicine relevant to Callantine's treatment was readily accessible, prison medical staff being capable of providing such medicine in less than five (5) minutes, with such medicine being in stock at all times relevant to the alleged violations.
43. Defendants Bennett, Bre, Sam, Heather, Dr. Campbell, and Dr. Byrd had agreed to refuse Callantine pain medication at the direction of Nurse Bennett, each with the same excuse that Nurse Bennett had not recorded anything about the pain in her report of Callantine's visit to nurse/sick call on 5-25-2023.
44. Upon information and belief, Defendants Bennett, Bre, Sam, Heather, Dr. Campbell, and Dr. Byrd met together in the prison medical services area at WVCF between 5-24-2023 and 6-1-2023 and during said meeting entered into an agreement to withhold pain medication from Callantine, and to thereafter attempt to persuade Callantine with the lie that Nurse Bennett had not reported anything regarding Callantine's pain and that the indicated doctors and nurses were bound by Nurse Bennett's lack of such recorded comments.
45. The Defendants were capable of disregarding CHI's policy regarding the withholding of pain medication, especially after their having been put on notice of Callantine's severe pain.
46. Defendants Bennett, Bre, Sam, Heather, Dr. Campbell, and Dr. Byrd, pursuant to Centurion policy and in furtherance of the conspiracy, actively withheld pain medication from Callantine and refused to resolve the issue with Nurse Bennett despite Callantine's repeated requests.

47. Callantine had been repeatedly told by the prison medical staff that, even though medical staff recommends its use, Callantine must buy pain medicine off of commissary because Centurion did not allow them to provide it. This was in addition to the fact that Nurse Bennett had supposedly not recorded anything regarding Callantine's pain in her medical report.
48. The named Defendants repeatedly refused Callantine pain medication, even though Callantine informed said Defendants that it would take him approximately two weeks before he would receive his next commissary order, wherein he might have been able to purchase pain medication.

**Specific facts regarding the alleged violations:**

49. On or about 2-9-2023 Callantine was seen for an infection in his left armpit (FIRST OCCURRENCE OF INFECTION) causing severe pain. A non-defendant nurse or physician diagnosed Callantine with a swollen lymph node and provided Callantine with antibiotics and pain medication. No biopsy or culture swab was done on the referenced wound at that time.
50. On 5-23-2023, Callantine filled out Health Care Request Form ("HCRF") 601699 regarding the infection in his right armpit (SECOND OCCURRENCE OF INFECTION).
51. On 5-24-2023, at approximately 2:47 pm, Callantine spoke over the in-cell intercom to Officer McKinley of M-Housing Unit at which time Callantine advised Officer McKinley that he was experiencing severe pain from an infection in his armpit. McKinley then advised Nurse Elizabeth Bennett ("Bennett") that Callantine had an infection in his armpit that was causing him severe pain. Nevertheless, Bennett refused to see Callantine regarding the matter.
52. At approximately 5:08 pm on the same day, Callantine told Officer Holt that the infection in his armpit hurt severely and asked if Holt could relay the information to McKinley and to medical. At 5:20 pm, Callantine requested to go to medical again, and McKinley spoke to Nurse Bennett, who gave the same answer as before and stated that Callantine would have to wait to be seen.
53. After shift change on 5-24-2023, at approximately 6:30 pm, Officer Gayheart called medical, relayed that Callantine was suffering from an infection causing severe pain, and was told that Callantine would be called to medical later that night. At 9:05 pm, Gayheart informed Callantine that Nurse Sam declined to see him even though he was in severe pain because it

6

was "not life threatening." Gayheart informed the nurse again that Callantine was in severe pain, at Callantine's request.

54. Callantine was not seen by medical, nor was he prescribed antibiotics or pain medication on 5-24-2023.

55. On 5-25-2023, at 6:20 am, the officer in the pod informed Callantine over the cell intercom that he had nurse sick call "sometime today" that had not been determined. At approximately 10:00 am, Callantine showed Officer McKinley the severe infection in his armpit.

56. At that time, McKinley to called medical at Callantine's request. McKinley spoke to Officer Foster at OSB (where medical is located) to ask when Callantine would be seen. Officer Foster responded that medical cancelled Callantine's sick call appointment.

57. At approximately 11:50 am, before lunch, Callantine asked McKinley to call medical and ensure that they knew that the pain is still severe and increased to pain in his bicep and upper arm down to his elbow.

58. At approximately 12:08 pm, after lunch line and outside of the dining hall, Callantine spoke to Lieutenant Stupey and showed him the infection in Callantine's armpit. Callantine informed the Lieutenant that he had been denied treatment and that medical cancelled his appointment. Callantine gave the Lieutenant his name and DOC number, and Lieutenant Stupey said he would look into it, that medical would likely see Callantine today after he spoke to them.

59. At 1:20 pm, Callantine contacted the pod officer and McKinley told him that Nurse Bennett said to put a warm compress on it, that it was the same condition I faced in February (which required antibiotics). Nurse Bennett said nothing about antibiotics or pain medicine and made this diagnosis without ever having seen Callantine.

60. At approximately 3:00 pm, the pod officer told Callantine to go to OSB with the insulin line. At approximately 4:45 pm, Callantine went to medical and nurse Bennett, while simultaneously disposing of an insulin needle and taking off her gloves, glanced in passing for less than one (1) second at Callantine's armpit and told him to cover up. Nurse Bennett documented Callantine's pain, increased severity of infection, and declined to take vitals. Bennett said she would e-mail the doctor.

61. After dinner chow line, Callantine returned to medical and asked nurse Bennett if she needed the doctor's permission to prescribe pain medicine, to which Bennett responded that she did

7

not. Nurse Bennett then left and came back with a prescription of an antibiotic called doxycycline and said she wouldn't give Callantine any Tylenol or other pain medicine.

62. Nurse Bennett stated in her report of Callantine's visit to Nurse/Sick Call on 5-25-2023 that "Patient complains of: pain... Signs & symptoms of infection: Yes increased redness, increased swelling, increased pain."

63. Callantine received no pain medication on 5-25-2023.

64. 5-26-2023: At approximately 7:45 am, at OSB, Callantine spoke to officer Michaels and told him that Callantine was experiencing severe pain, and that he had been in pain for days. Michaels went into the medical office and spoke to Dr. Campbell who refused to prescribe pain medication because Bennett had not requested Callantine receive any.

65. At approximately 8:30 am, officer Michaels spoke to Dr. Campbell, again at Callantine's request, and told her that Callantine needed pain medication. Dr. Campbell advised Callantine to take ibuprofen or Tylenol, but refused to give Callantine any, again. Callantine said he would order some, but he needed it "now." Around the same time, Callantine unexpectedly met Dr. Byrd in the waiting area outside of medical and relayed his symptoms and pain, and the urgency despite his intention to buy medication off of commissary. Dr. Byrd told Callantine to fill out an HCRF and wait to be seen.

66. Callantine asked Michaels to relay once more to Dr. Campbell that he was in severe pain and for a third time, Dr. Campbell refused to see Callantine or prescribe pain medication.

67. For a fourth time, at approximately 8:40 am, officer Michaels relayed that Callantine was in severe pain to both Dr. Byrd and Dr. Campbell, at Callantine's request.

68. Callantine filled out a grievance on 5-26-23 regarding the deliberate indifference of nurses Bennett, Bre, Sam, and Heather, as well as Dr. Byrd and Dr. Campbell.

69. At approximately 11:45 am, Callantine spoke to Defendant Warden Vanahiel and told the Warden about his infection and severe pain. Callantine told him that he had repeatedly tried to get pain medication and had been refused. The Warden said that normally Tylenol and Ibuprofen is used for pain relief, to which Callantine said that he would place a commissary order as soon as he could, but that he needed medicine "now."

70. During the conversation, Callantine relayed his experiences with medical over the last several days and the Warden said he would address the issue.

71. Later that same day, at approximately 7:20 pm, after shift change, officer Haviland called medical and talked to nurse Heather, who advised Haviland that because Nurse Bennett did not request pain medication, even though it was recommended as a course of treatment, that Heather would not provide Callantine any pain medication.
72. At approximately 7:22 pm, officer Hartz called over the cell intercom and asked what the issue was and Callantine relayed that he is in severe pain and needed pain medication "RIGHT NOW." Officer Hartz called medical and Nurse Heather refused Callantine treatment again.
73. At 7:55 pm, Sgt. Strosnyder went to Callantine's cell in M-Housing Unit and told Callantine that, according to Nurse Heather, because Nurse Bennett had not prescribed pain medication or reported pain, Nurse Heather could not and would not order Callantine any pain medication, and that Nurse Heather could not and would not do anything else about it. Sgt. Strosnyder said he would try to get Nurse Heather to see Callantine, if even briefly, to better determine the situation.
74. At 11:30 pm, Callantine went to medical, where Nurse Heather looked at Callantine's armpit infection and said it was "just a boil." Heather told Callantine that even though he was in pain, and had been complaining of pain for several days now, Centurion policy does not prescribe the recommended pain medication because it can be bought on commissary.
75. Callantine told Nurse Heather that had he ordered it that same day, that it would still take two weeks for Callantine to receive the order. Nurse Heather told Callantine that Bennett had not addressed the pain in her report when Callantine had been seen. Callantine responded that the pain was the entire reason why he could not wait some indeterminate amount of time to be seen.
76. Nurse Heather told Callantine that a combination between Centurion policy and Nurse Bennett's instruction (either implied or expressed) was why Callantine had not received pain medication.
77. Defendant Vanahiel failed to ensure that Callantine received the pain medication recommended by medical staff on 5-26-2023.
78. 5-27-2023: At approximately 8:00 pm, Callantine spoke to the floor officer Hartz about the lack of documentation for the wing regarding Callantine's medical problems. Hartz told Callantine that none of the phone calls to medical were logged other than what he and Haviland logged the night before.

79. At approximately 8:18 pm, Sgt. Strosnyder spoke to medical on the phone to ask about the pain medication Callantine needed. Strosnyder was informed that Heather was not there, and asked medical to contact him on the radio when Heather returned.
80. At approximately 8:42 pm, Callantine was told that he had to go to OSB with the insulin line at 9 pm that night.
81. At approximately 8:52 pm, Callantine filled out HCRF 597416 asking for a full-panel bloodwork to determine the cause of the infection in Callantine's armpit.
82. At approximately 9:22 pm, Callantine went to medical and received nine (9) 500 MG Tylenol tablets from nurse Heather, who informed me that it would be good for two days. Callantine handed her HCRF 597416 and explained that he was of the understanding that the repeated diagnosis of a swollen lymph node posed a serious concern for cancer.
83. On 5-28-2023: At approximately 5:17 pm, Callantine filled out HCRF 565556, requesting more pain medication to get him through until his commissary order came in.
84. On 5-29-2023: at approximately 8:00 pm, Callantine took the last of his Tylenol.
85. On 5-30-2023: at approximately 7:22 am, Callantine was informed that he had a nurse/sick call appointment at 1:30 pm. Callantine was in excruciating pain.
86. At approximately 9:40 am, Nurse Kim Hobson responded to Callantine's appointment for HCRF# 565556 and looked at Callantine's infection without further diagnostics and concluded that it was "just an infection."
87. Callantine told Nurse Hobson about his troubles in getting any pain medication, even when it was advised by medical staff. Nurse Hobson left, and returned approximately 30 seconds later with a 30 count card of 500 mg Tylenol and directed Callantine to only take two (2) tablets a day.
88. Callantine informed Nurse Hobson that Nurse Bennett had told Callantine that his condition was the same as it had been in February, without even looking at Callantine before cancelling his appointment and telling Callantine to "just put a hot rag on it."
89. Nurse Hobson did not know Callantine had the same condition in February before declaring it an infection, and she told him she would schedule bloodwork to try to determine the exact cause of the severe pain and swelling in his arm.
90. On 6-3-2023 Callantine arrived at Nurse/sick call and was seen by Nurse Berg. When asked what the visit was for, Callantine informed Berg about the infection he suffered from. Berg

10

said "that is not what we are here for," and disregarded Callantine's advisement of his visit with Nurse Hobson.

91. On 6-16-2023, Callantine had a blood draw for a full-panel work-up.

92. On 6-17-2023, the results for Callantine's bloodwork were returned, showing a Vitamin D deficiency and an elevated MPV, which was shown as "flagged" with an "H," which presumably means "high."

93. An elevated MPV is a high platelet count and is a common warning sign of possible cancer.

94. On 8-5-2023, Callantine began developing yet another lump in his armpit. The lump grew significantly in pain and severity over the next 24 hours (THIRD OCCURRENCE OF INFECTION).

95. On 8-6-2023, at approximately 5:10 pm, Callantine spoke to Officer Bishop and showed Bishop the infection in his armpit.

96. Bishop called medical and relayed Callantine's symptoms to the officer at OSB. Bishop advised Callantine that medical would not see him.

97. At approximately 5:20 pm, Bishop said he had called medical again, and that Centurion Nurse 1 said she was "aware of who it is, and what it is." Centurion Nurse 1 said to fill out an HCRF.

98. At approximately 6:25 pm, and after shift change, floor Officer Fields spoke to Defendant Heather, who said that she was reviewing Callantine's charts. Callantine asked the officer to relay that he was in severe pain and what he had seen when he looked at Callantine's armpit infection.

99. At approximately 6:41 pm, Callantine filled out another HCRF, stating verbatim:
"I have an infection in my armpit. This is the third time since February. I am in severe pain. I have not had a biopsy, or blood screening, to identify what it is and what is causing it. It is worse now than both other times combined. It is causing me a migraine persistently. I have thrown up and have lost mobility in my arm due to the pain." and placed it in the medical box.

100. At approximately 7:00 pm, officer Fields told Callantine to fill out another HCRF to take directly to medical when they next saw him. Fields told Callantine that medical would see Callantine that night.

101. Callantine filled out HCRF 601821, detailing essentially the same information from HCRF 601820 and incorporating the information from HCRF 601820 by reference as well.

102. At approximately 7:30 pm, Callantine was sent to medical where Defendant Heather had, among lingering speculation of what the problem was, cleaned and took pictures of the affected area and infection to send to the Physician. At that time, Callantine was given a shot of lidocaine in the left buttocks and a shot of Tordol in the left arm for the pain and inflammation. Callantine was sent back to his cell with a 30 count card of Bactrim.

103. On 8-7-2023: at approximately 10:30 am, Callantine asked Officer McKinley to call medical to see him and to get pain medicine. Thereafter, Callantine was informed he had been put on the sick-call list for later in the day.

104. At approximately 10:50 am, after M-house lunch line, Callantine showed Major Voightschild and another Lieutenant the growth under his arm. Callantine was directed to see Sgt. Mallott and to have Mallott take Callantine to medical.

105. Callantine was seen by Nurse Hobson. Callantine told Hobson that no culture or bloodwork had ever been done, that Callantine was in severe pain, and that this was the third recurrence of what was, by all available evidence, the same type of infection.

106. During the consultation, Callantine expressed his concern that the antibiotics he had been given had not worked properly, and that he had been given the same treatment each time. Hobson noted that the redness from the infection had possibly receded to some small degree since the night before.

107. Nurse Hobson squeezed one (1) of the three (3) referenced nodes and obtained a culture.

108. Before the end of the consultation, Dr. Byrd arrived, looked at Callantine's infected nodes, and commented that it was bad. Byrd suggested lancing it, and given the extreme pain Callantine had been experiencing, he agreed.

109. Byrd cleaned the area with iodine, and shot lidocaine into only two (2) of the three (3) nodes, while Nurse Hobson gave Callantine a shot of Tordol in the left arm. Dr. Byrd began using the scalpel and made an incision in the first node. Callantine told Byrd that he felt pain beyond the point of the numbed area, and that he believed Byrd had gone too deep with his incision.

110. Byrd then incised the second node, with no added pain.

111. As an afterthought, Byrd said, "I know Nurse Hobson squeezed it already, but we might as well get this one too," Byrd proceeded to incise the third node that had not been numbed.

112. Byrd's third incision caused Callantine further considerable pain, and he screamed. Callantine's legs began to tremble. Byrd then attempted to pack the first wound with an antibiotic strip of some sort, which hurt too much to continue, despite the lidocaine.
113. Another nurse came by to clean and dress the wound, and Callantine was sent back to the housing unit with gauze pads.
114. On 8-8-2023: at approximately 9:00 am, Callantine was sent to sick call for Nurse Hobson to change his dressings. The redness from the infection now covered twice the area it had before, reaching halfway down to Callantine's elbow. Nurse Hobson told Callantine that if it did not clear after ten (10) days of antibiotics, to call for her.
115. At approximately 10 am, Callantine marked the bounds of his infection to track its spread.
116. At approximately 8:30 pm, Callantine noticed the redness had reached outside of the bounds that he had previously marked.
117. At 8:45, after a shower, Callantine notified the floor Officer and Sgt. Blackmun standing next to him of Callantine's condition by showing both officers his infection and the progress he had tracked. Blackmun's first words, verbatim, were: "Holy shit."
118. Blackmun immediately called and informed medical of Callantine's condition, and informed Callantine that Centurion Nurse 2 said medical would not see him because they were too busy.
119. On 8-9-2023: At approximately 7:00 am, Callantine marked the new bounds of the infection, and notified Officer Bishop of the progress of his condition. Bishop called medical.
120. At approximately 10:20 am, at OSB, Callantine was given a shop of Rocephin mixed with Lidocaine after showing non-Defendant Lisa Wolfe the exacerbation of his symptoms. Wolfe's first words upon seeing the progress were, verbatim: "Holy shit."
121. For each of the three days, from 8-9-2023 to 8-11-2023, Callantine received a shot of Rocephin and Lidocaine mixture in addition to his then-current regimen of antibiotics.
122. After the last shot of Rocephin/Lidocaine, Callantine's infection finally began to clear up.
123. The symptoms associated with each occurrence of Callantine's infections were identical, and upon information and belief, Callantine had had MRSA since his February visit to medical.

124. The repeated pattern of indifference to Callantine's medical needs resulted in Callantine's legitimate fear for his life or that his arm might have to be amputated. Callantine fears that if this pattern continues, his infection, if it returns, will likely result in his death or further significant harm.
125. Callantine has permanent scarring from the repeated occurrence of his infections, which were sustained as a result of the Defendants failure to exercise reasonable professional judgment in treating Callantine's MRSA infection.
126. The Defendants' outright refusal to treat Callantine's pain interrupted Callantine's daily activities, making it impossible for him to exercise, eat, or sleep, in addition to interrupting his normal daily activities which contribute to Callantine's overall mental and physical wellbeing.

## VII. RELIEF

WHEREFORE, Plaintiff requests this Court grant the following relief:

A. Declare that Defendants Bennett, Bre, Sam, Heather, Dr. Campbell, and Dr. Byrd violated Plaintiff's Eighth Amendment rights through their deliberate indifference when they denied Plaintiff pain medicine for his MRSA infection, thereby both prolonging and exacerbating Plaintiff's severe pain for a non-medical reason.

B. Declare that Defendants Bennett, Bre, Sam, Centurion Nurse 1, and Centurion Nurse 2 violated Plaintiff's Eighth Amendment rights through their deliberate indifference when they delayed treatment for Plaintiff's MRSA infection, thereby exacerbating Plaintiff's condition for a non-medical reason.

C. Declare that Defendants Bennett, Bre, Sam, Heather, Dr. Campbell, and Dr. Byrd violated Plaintiff's rights under the Eighth Amendment when they conspired to and did in fact deprive Plaintiff of pain medication which had been repeatedly recommended for Plaintiff's MRSA infection.

D. Declare that Defendant Centurion Nurse 1 violated Plaintiff's rights under the First Amendment when she retaliated against Plaintiff for his having filed a grievance against prison medical staff for their having denied Plaintiff prompt treatment for his painful MRSA infection.

E. Declare that Defendant Centurion Health of Indiana, LLC, violated Plaintiff's rights under the Eighth Amendment when they maintained a policy that, in addition to the alleged conspiracy, was a vehicle for the prison medical staff Defendants' withholding of the recommended treatment of pain medication, which resulted in the unnecessary prolonging of the Plaintiff's pain for a non-medical reason.

F. Declare that Defendant Centurion Health of Indiana, LLC, is vicariously liable when they employed Defendants Bennett, Bre, Sam, Heather, Dr. Campbell, Dr. Byrd, Centurion Nurse 1, and Centurion Nurse 2, who, during the course of their employment, violated Plaintiff's constitutional rights.

G. Declare that Defendant Vanahiel was deliberately indifferent to Plaintiff's serious medical needs, in violation of the Eighth Amendment, by failing to exercise the authority of his position to ensure that prison medical staff provided constitutionally adequate treatment for Plaintiff's severe pain resulting from his infection, thereby unnecessarily prolonging Plaintiff's pain for a non-medical reason.

H. Award compensatory and punitive damages for Plaintiff's physical and emotional suffering against each Defendant in the total amount that Plaintiff is entitled to by law.

I. Grant Plaintiff such other just and proper relief as it may appear Plaintiff is entitled to.

Respectfully submitted, this 7th day of December, 2023.

_____
Zachary W. Callantine, Plaintiff, *pro se*
Wabash Valley Correctional Facility
P.O. Box 1111 Carlisle, IN, 47838

## AFFIRMATION OF PLAINTIFF

I, the plaintiff in the aforementioned cause, do hereby affirm under the penalties for perjury that I have read all of the statements contained in this complaint and that I believe them to be true and correct to the best of my personal knowledge and belief.

Signed this 7 th day of December, 2023.

Zachary W. Callantine, Plaintiff, *pro se*
Wabash Valley Correctional Facility
P.O. Box 1111 Carlisle, IN, 47838

### Certificate of Service

I, Zachary Callantine, do hereby affirm under the penalties for perjury that a true and correct copy the foregoing Verified Complaint for Damages was served upon all parties by Indiana's Electronic Prison (E-Filing) system on this 7th day of December, 2023.

Distibution:

Centurion Health of Indiana, LLC,
Elizabeth Bennett,
Centurion Nurse "Sam,"
Centurion Nurse "Bre,"
Centurion Nurse "Heather,"
Centurion Nurse 1,
Centurion Nurse 2,
Dr. Samuel Byrd, MD,
Dr. Campbell,
Kimberly Hobson,
Bobby Riggs,
Taylor Berg,
Frank Vanahiel,